**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Donald Paul HUTSON,
Defendant–Appellant.**

No. 87–1201.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 11, 1988.

Decided April 8, 1988.

James F. Hewitt, Federal Public Defender, and Christopher J. Cannon, Asst. Federal Public Defender, San Francisco, Cal., for defendant-appellant.

Joseph P. Russoniello, U.S. Atty., Sanford Svetcov and Jeffrey W. Lawrence, Asst. U.S. Attys., San Francisco, Cal., for plaintiff-appellee.

Before ALDISERT,[*] WALLACE and SCHROEDER, Circuit Judges.

ALDISERT, Senior Circuit Judge:

The major question for decision in this appeal from a jury conviction and sentence for violating the federal extortion law, 18 U.S.C. § 876, is the constitutionality of the statute. Appellant Donald Hutson argues that the statute is overbroad and vague. Because we reject these challenges, we will consider Hutson's additional contention that the government's reference during his cross-examination to statements made by him in a magistrate's pre-trial inquiry regarding eligibility for appointed counsel violated his rights under the fifth and sixth amendments to the United States Constitution. We determine that there was no reversible error, and thus will affirm Hutson's conviction.

Jurisdiction was proper in the district court based on 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291, and the defendant timely filed his appeal under Rule 4(b), F.R.App.P.

I.

Donald Hutson, a married man, is the jilted lover of Wanda Howard. After Howard married an Air Force officer, Hutson decided to recoup some of the money he spent on Howard while they were together. He wrote Howard on January 9, 1987, demanding a $10,000 payment on her alleged "debt." Hutson's "collateral" for this debt was sexually explicit photographs of the couple: 73 polaroids, 94 35mm pictures plus negatives, and four 8mm movies. Hutson enclosed four photos with his letter to "refresh [her] memory," and gave her 30 days to send him the $10,000 by certified check, failing which he would send copies of the "collateral" to her parents, relatives, and associates.

On January 22, 27, and 31, Hutson sent Howard letters reminding her of the due date for cash payment. By this time, Howard had contacted the United States Postal Inspectors. On February 8, at the direction of the inspectors, Howard sent a personal check for $10,000 from Omaha to San Francisco, where it was placed in Hutson's post office box. Hutson retrieved it on February 11 and was arrested as he left the building with the check in his wallet. A grand jury subsequently indicted Hutson for each of the four mailings under the federal extortion statute, 18 U.S.C. § 876.

Hutson's defense at trial was that he simply did not mail the letters. In his opening statement, defense counsel portrayed Hutson as a man who made a good living, and therefore had no motive to extort $10,000. In addition, Hutson testified at trial that he worked as a product manager for the private label division of McKesson Drug Company. The government subsequently cross-examined Hutson about statements he made to the magistrate regarding his personal finances that enabled him to obtain court-appointed counsel. The government attempted to show that Hutson had a cash shortfall of approximately $550 per month, and thus had a motive to

---

[*] Ruggero J. Aldisert, Senior Judge, United States Court of Appeals for the Third Circuit, sitting by designation.

extort money from Howard. The jury convicted Hutson on all counts.

## II.

■ Hutson argues that the federal extortion statute is overbroad and vague and thus violates his first amendment rights. We exercise *de novo* review over Hutson's constitutional arguments. *See United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

Title 18 U.S.C. § 876 provides:

Whoever, with intent to extort from any person any money or other thing of value, knowingly so deposits [in any post office or authorized depository for mail] or causes to be delivered, as aforesaid, any communication ... addressed to any other person and containing any threat to injure the property or reputation of the addressee or of another ... shall be fined not more than $500 or imprisoned not more than two years, or both.

In *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–95, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982), the Supreme Court set out the analytical framework for overbreadth and vagueness challenges to statutory enactments:

In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail. The court should then examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications. [An individual] who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.

*See also Schwartzmiller v. Gardner*, 752 F.2d 1341, 1346–47 (9th Cir.1984). Application of the overbreadth doctrine to preclude enforcement of a statute is "strong medicine" to be employed "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973).

## A.

■ Hutson's overbreadth claim is based on *Wurtz v. Risley*, 719 F.2d 1438 (9th Cir.1983), where this court struck down on overbreadth grounds a Montana statute prohibiting intimidation. We believe there are major differences between the Montana statute and the federal law at issue here. The state statute provided that "[a] person commits the offense of intimidation when, with the purpose to cause another to perform or to omit the performance of any act, he communicates to another a threat to perform without lawful authority any of [certain] acts." *Id.* at 1439. We struck down the state law because the statutory language applied so broadly to threats of minor infractions, threats not reasonably likely to induce a belief that they would be carried out, and threats unrelated to any induced or threatened action, "that a great deal of protected speech [was] brought within the statute." *Id.* at 1442. By comparison, the federal statute at issue in the present case proscribes only threats "to injure the property or reputation of the addressee or of another." 18 U.S.C. § 876.

The extortion statute favorably compares with the federal retaliation statute, 18 U.S.C. § 1513, which punishes those who threaten to do bodily harm to or destroy or damage the property of an informant as retaliation for his informing. The retaliation statute survived constitutional challenge in *United States v. Velasquez*, 772 F.2d 1348 (7th Cir.1985), *cert. denied*, 475 U.S. 1021, 106 S.Ct. 1211, 89 L.Ed.2d 323 (1986). The court observed that the statute prohibits only threats made with "intent to retaliate," and concluded that "the statute's limited scope takes it out of the realm of social or political conflict where threats to engage in behavior that may be unlawful may nevertheless be part of the marketplace of ideas, broadly conceived to embrace the rough competition that is so much a staple of political discourse." *Id.* at 1357.

In *United States v. Gilbert*, 813 F.2d 1523, 1526 (9th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 173, 98 L.Ed.2d 127 (1987), we upheld as constitutional against an overbreadth challenge section 901 of the Fair Housing Act, 42 U.S.C. § 3631, which prohibits an individual who "by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere" with any person's activities with respect to housing on account of that person's race, color, religion, sex, or national origin. In analyzing the statute, we said that "[t]here is no question that the proscription of force or threat of force is within the government's powers." *Id.* at 1531.

Because the statute in the present case is limited to extortionate threats, it does not regulate speech relating to social or political conflict, where threats to engage in behavior that may be unlawful may nevertheless be part of the marketplace of ideas. *Gilbert*, 813 F.2d at 1531; *see Velasquez*, 772 F.2d at 1357. The "intent to extort" requirement of section 876 guarantees that the statute reaches only extortionate speech, which is undoubtedly within the government's power to prohibit. *See United States v. Quinn*, 514 F.2d 1250, 1268 (5th Cir.1975) ("It may categorically be stated that extortionate speech has no more constitutional protection than that uttered by a robber while ordering his victim to hand over the money, which [has] no protection at all."), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1430, 47 L.Ed.2d 361 (1976). Therefore, the statute does not regulate "a great deal of protected speech," the infirmity condemned in *Wurtz v. Risley*, 719 F.2d 1438, 1442 (9th Cir.1983). We will reject Hutson's overbreadth challenge.

### B.

In *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), the Court set forth an authoritative articulation of the vagueness doctrine, representing a synthesis of past teachings:

It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.

Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of [those] freedoms." Uncertain meanings inevitably lead citizens to "'steer far wider of the unlawful zone' ... than if the boundaries of the forbidden areas were clearly marked."

*Id.* at 108–09, 92 S.Ct. at 2298–99 (footnotes omitted). "A statute may be void for vagueness if it fails to give adequate notice to people of ordinary intelligence concerning the conduct it proscribes." *Gilbert*, 813 F.2d at 1530; *see United States v. Smith*, 795 F.2d 841, 847 n. 4 (9th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1964, 95 L.Ed.2d 535 (1987); *Schwartzmiller v. Gardner*, 752 F.2d 1341, 1345 (9th Cir. 1984). Statutes failing to pass constitutional muster have attempted to penalize "misconduct," *Giaccio v. Pennsylvania*, 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966), conduct that was "annoying," *Coates v. City of Cincinnati*, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), "reprehensible," *Giaccio, supra*, and "prejudicial to the best interests" of a city, *Gelling v. Texas*, 343 U.S. 960, 72 S.Ct. 1002, 96 L.Ed. 1359 (1952). Other federal courts have voided prohibitions of conduct that "reflects discredit," *Flynn v. Giarrusso*, 321 F.Supp. 1295 (E.D.La.1971), or tends to "the corruption of morals," *Oestreich v. Hale*, 321 F.Supp. 445 (E.D.Wis.1970).

We thus come to these questions: Does the federal extortion statute give a person of ordinary intelligence fair notice of the conduct it forbids? We answer this question affirmatively. Does this statute encourage erratic arrests and convictions? We do not think so.

Hutson alleges that the extortion statute did not provide fair notice that it proscribed conduct such as his. Hutson's argument is based on the common law definition of extortion, which allegedly required "the corrupt collection of an unlawful fee by an officer under color of office, with no proof of threat, force, or duress required." Br. for appellant at 45. The crime of extortion, however, has taken on a far wider meaning than the original common law concept, and courts have repeatedly sanctioned this expanded view in interpreting statutes involving extortion. In *United States v. Nardello*, 393 U.S. 286, 89 S.Ct. 534, 21 L.Ed.2d 487 (1969), the Supreme Court held that "extortion" as used in the Travel Act, 18 U.S.C. § 1952, applied to private individuals who threatened people with exposure of their homosexuality unless the individuals paid for silence. "Although only private individuals are involved, the indictment encompasses a type of activity generally known as extortionate since money was to be obtained from the victim by virtue of fear and threats of exposure." *Id.* at 296, 89 S.Ct. at 539; *see Perrin v. United States*, 444 U.S. 37, 48, 100 S.Ct. 311, 317, 62 L.Ed.2d 199 (1979); *United States v. Hughes*, 411 F.2d 461, 462 (2d Cir.), *cert. denied*, 396 U.S. 867, 90 S.Ct. 145, 24 L.Ed. 2d 120 (1969).

Hutson contends that Congress retained the common law meaning of extortion—corrupt acts by a public official—in 18 U.S.C. § 876. We are satisfied, however, that the reasoning in *Nardello* applies with equal force to appellant's argument: "If Congress so intended, then [the federal extortion statute] would cover extortionate acts only when the extortionist was also a public official." 393 U.S. at 292–93, 89 S.Ct. at 538. However, the language of the extortion statute, "whoever" extorts money or other things of value from any person, "includes private persons as well as public

officials." *Id.* at 293, 89 S.Ct. at 538. Therefore, we reject Hutson's vagueness challenge.

### III.

We now turn to Hutson's contention that the government's reference during his cross-examination to contents of an affidavit Hutson used to process a request for court-appointed counsel violated his rights under the fifth and sixth amendments. Hutson contends that the fifth and sixth amendments guarantee him the best of two worlds: he may represent under oath to the judiciary in a pre-trial application for court-appointed counsel that he has little money, yet contend at trial that he had no motive to commit extortion because of his strong financial position. Whether he can have it both ways involves not only an inquiry into constitutional law, but an analysis of those mandatory trial procedures that a party must follow before a reviewing court will notice his assertions of error on appeal.

It was only in a motion for new trial that Hutson first asserted that the government's use during his cross-examination of statements he made to the magistrate in applying for counsel violated his fifth amendment right against self-incrimination, his sixth amendment right to appointed counsel, and his right to equal protection of the laws as guaranteed by the due process clause of the fifth amendment. *Schneider v. Rusk*, 377 U.S. 163, 168, 84 S.Ct. 1187, 1190, 12 L.Ed.2d 218 (1964); *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). Hutson, however, did not raise the self-incrimination or equal protection arguments during trial. In addition, Hutson's sixth amendment objection during trial was extremely limited. Defense counsel claimed that the jury might draw adverse inferences against Hutson because he was represented by a public defender. Counsel made no comprehensive sixth amendment objection at trial comparable to that presented on appeal. Hutson now claims that the district court committed reversible error by allowing the government to introduce alleg-

edly inculpatory evidence elicited by the magistrate when he applied for court-appointed counsel.

The record is crystal clear. At trial, the government's cross-examination attempted to show that Hutson's financial eligibility for a public defender tended to discredit his claim—made during opening statement and his direct examination—that he had substantial employment and thus no financial motive for extortion. The government never suggested that Hutson was ineligible for a public defender, and the cross-examination cast no aspersion on the fact that the defendant was represented by appointed counsel.

Defense counsel conceded that "examining Mr. Hutson about his financial status" was clearly relevant, ER 6 at 2–320, and proceeded to make only a very limited objection to the use of Hutson's statements to the magistrate to qualify for appointed counsel. Counsel objected that, by introducing this evidence, "this whole air of innuendo waffs through the jury box that there is something improper about Mr. Hutson being represented by a public defender." *Id.* at 2–321. Defense counsel added that he had "never brought out [on direct examination] the subject of a public defender." *Id.*

After defense counsel objected to the government's cross-examination, the district court instructed the jury that there was nothing improper about being represented by a public defender. The attorney for the government stated to the jury that "in no way are any of these questions meant to cast any aspersions, negative comments or anything about Mr. Cannon or the public defender's office." ER 6 at 2–325. The judge subsequently told the jurors that he would allow the government to introduce Hutson's claim of eligibility for appointed counsel as the first step in rebutting the defendant's trial defense of lack of financial motive. Follow-up questions by the government during Hutson's cross-examination demonstrated that he had a cash shortfall of approximately $550 a month. *Id.* at 2–330.

### A.

On appeal, as in the post-trial motion, Hutson's constitutional objections track a much wider compass. He has expanded his sixth amendment argument to include contentions never raised at trial before the close of evidence and jury instructions. Basically, Hutson contends that although the Supreme Court has drawn back from previously-accepted fourth amendment protections, citing *United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), it has not done so in areas involving the sixth amendment. From this premise, he moves to the backdrop of *Simmons v. United States*, 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968), stating that statements made by a defendant in a suppression hearing may not be used against the individual at trial. He builds on this to argue that if *Simmons* protects less-favored fourth amendment claims, it must surely apply to more-favored rights under the sixth amendment. From this, Hutson concludes that information elicited by the *prosecution* in *Simmons* is equivalent to information requested by the *judiciary* in an application for court-appointed counsel. Whether this comparison is a permissible logical progression or an impermissible quantum leap, *see, e.g., United States v. Kahan*, 415 U.S. 239, 94 S.Ct. 1179, 39 L.Ed.2d 297 (1974), is a question we do not meet because of the procedural infirmities explained below.

Although Hutson was advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), on at least two occasions prior to preparing the affidavit seeking court-appointed counsel, he nevertheless asserts a fifth amendment deprivation. Here, too, we do not meet the threshold question (even assuming that *Miranda* warnings had not been previously given) of whether information elicited by the federal judiciary in an official form previously described by us as "a useful tool for appropriate inquiry into one's ability to obtain legal assistance," *United States v. Ellsworth*, 547 F.2d 1096, 1097 (9th Cir.1976), *cert. denied*, 431 U.S.

931, 97 S.Ct. 2636, 53 L.Ed.2d 247 (1977), calls into play fifth amendment strictures.

Finally, Hutson asserts a due process/equal protection contention, *see Jimenez v. Weinberger*, 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974), *Griffin v. Illinois*, 351 U.S. 12, 19, 76 S.Ct. 585, 590–91, 100 L.Ed. 891 (1956) (Black, J.), arguing that these protections preclude the government from proving motive by cross-examining him with respect to a financial affidavit he prepared in an effort to obtain counsel. Hutson argues that this distinguishes him from other defendants based on his financial status, and is thus impermissible under *Tate v. Short*, 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971), and *Williams v. Illinois*, 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970). We have also decided not to meet this issue.

### B.

■ The record in the present case demonstrates that defense counsel had ample opportunity during trial to make a specific objection on constitutional grounds to the government's cross-examination. Significantly, however, Hutson did not present his formidable constitutional arguments to the district court prior to the jury's verdict. Because the defendant did not alert the district judge during trial to the sophistication and subtleties of the arguments later presented in a motion for new trial and more thoroughly to us on appeal, the district court was deprived of the chance to correct any defects and the government proceeded in good faith to introduce evidence that was clearly relevant. In *On Lee v. United States*, 343 U.S. 747, 750 n. 3, 72 S.Ct. 967, 970 n. 3, 96 L.Ed. 1270 (1952), the Court noted that a general objection is insufficient to preserve a specific claim such as violation of a constitutional provision in obtaining evidence. "[T]he orthodox rule of evidence requiring specification of the objection is buttressed by the uniform policy requiring constitutional questions to be raised at the earliest possible stage in the litigation." *Id.; see United States v. Indiviglio*, 352 F.2d 276, 279–80 (2d Cir.1965)

(en banc), *cert. denied*, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966).

Because Hutson did not specifically raise his constitutional arguments during trial, our threshold inquiry is whether the government's cross-examination "amounts to plain error which we may review even absent a timely objection." *United States v. Lopez*, 575 F.2d 681, 685 (9th Cir.1978). In *United States v. Young*, 470 U.S. 1, 17 n. 14, 105 S.Ct. 1038, 1047 n. 14, 84 L.Ed.2d 1 (1985), the Supreme Court broke down the plain-error inquiry into two parts: whether the error "seriously affected 'substantial rights,' " and whether the error "had an unfair prejudicial impact on the jury's deliberations." This court has consistently applied a two-part test similar to that in *Young*. In *United States v. Giese*, 597 F.2d 1170, 1199 (9th Cir.), *cert. denied*, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979), we stated that "[a] plain error is a highly prejudicial error affecting substantial rights." *See also United States v. Sherman*, 821 F.2d 1337, 1339 (9th Cir. 1987); *United States v. Bustillo*, 789 F.2d 1364, 1367 (9th Cir.1986); *United States v. Perez*, 491 F.2d 167, 174 (9th Cir.), *cert. denied*, 419 U.S. 858, 95 S.Ct. 106, 42 L.Ed. 2d 92 (1974). This test, like the inquiry annunciated by the court in *Young*, has two areas of analysis: whether the error was highly prejudicial, and whether the error affected the substantial rights of the defendant.

Viewed against the formidable backdrop of incriminating evidence in the present case, we conclude that the government's cross-examination did not have "an unfair prejudicial impact on the jury's deliberations" and thus did not constitute plain error. First, as to his financial status, Hutson admitted during cross-examination that he had a cash-flow problem. The statements on his application to the magistrate for court-appointed counsel, therefore, were merely cumulative. Second, the government presented overwhelming evidence at trial that showed that the defendant mailed the threatening letters. We now proceed to review this evidence.

Hutson admitted that he sent Wanda Howard a handwritten Christmas card in December 1986. The return address on the card was the same return address used in the extortion letters. On January 12, 1987, Howard received a typewritten letter in a brown manila envelope demanding that she send a certified check for $10,000 to "Don Hutson, 41 Sutter Street, Suite 1642, San Francisco, California 94101." 1 RT 58; Plaintiff's Exhibit 1. The envelope was postmarked San Francisco and had Hutson's mail drop return address in the upper left hand corner. Additionally, the letter contained four xerox copies of sexually explicit photos of Howard. (Two latent fingerprints were found on this envelope and the xerox copies. At trial, Hutson admitted that the fingerprints were his.) Howard and her husband consulted an attorney who referred them to the Federal Bureau of Investigation; the Howards eventually contacted United States Postal Inspector Comfort.

On January 26, 1987, Wanda Howard received a second letter. This letter was in a brown manila envelope addressed to Howard at her place of employment and contained markings identical to the first letter. It, too, was postmarked San Francisco, California. Dated January 20, 1987, this letter stated, "You have 20 days left with which to fulfill your financial obligation. February 10, 198[7] is the last day to reclaim your photos." 1 RT 56. Mrs. Howard took both letters to Postal Inspector Comfort. When Howard spoke with Comfort, she explained her entire relationship with Donald Hutson, including the sexually explicit photos, and how she had received the letters.

On January 27, 1987, Inspector Comfort directed Mrs. Howard to write a letter to Hutson, requesting an extension of time to make payments. The letter also inquired about a possible settlement, and requested that any future mailings be addressed to a post office box in Omaha. The United States Postal Inspectors controlled this box, as it was located in their local office. Inspector Comfort subsequently mailed Howard's letter certified mail, return receipt requested, to Hutson's 41 Sutter Street mail drop.

On January 30, 1987, Wanda Howard received a third typewritten letter, which was mailed from San Francisco and postmarked three days earlier. The letter arrived at Howard's school address in a manila envelope identical to the first two, and contained markings exactly like the earlier letters. Three days later, on February 2, 1987, Howard received a fourth letter. This letter came in a brown manila envelope, was postmarked January 31, 1987, from North Suburban, Illinois, was sent to Howard at the same address, and contained similar markings to the earlier three letters. Hutson later would admit that he had been in Chicago on business on January 30, 1987.

On February 6, Comfort directed Howard to write Hutson a second letter. The letter was post-dated February 8, 1987; it informed Hutson that a personal check in the amount of $10,000 was enclosed. Comfort placed this letter and the check in an express mail envelope and forwarded it to Inspector Scott Morrell in San Francisco. On February 11, 1987, Inspector Morrell placed the envelope and check in Don Hutson's private mailbox at "The Mailbox," 41 Sutter Street, Suite 1642. The Mailbox's owner then called Hutson to inform him that a package had been delivered. When Hutson arrived, he opened his mailbox, took out the package, and thanked the owner for calling him. Hutson said that he had been waiting for the package and had just closed a big real estate deal for $10,000. Hutson told the owner that he was going out to celebrate.

Postal Inspector Morrell trailed Hutson out of the building and, with other postal inspectors, followed him to the BART station on Montgomery Street. Morrell then arrested Hutson. The inspectors orally gave Hutson his *Miranda* rights, and subsequently conducted a search of Mr. Hutson's person. Hutson had Howard's February 8 letter in his left hand. In his wallet, the inspectors found the check that Howard had sent with the February 8 letter. The inspectors took Hutson back to

the postal service offices and again read him his *Miranda* warnings. The inspectors then supplied Hutson with a written waiver form. Hutson signed it and agreed to make a statement.

The inspectors asked Hutson about the sexually explicit photographs and he told them that he had taken a few of them during his relationship with Howard. When the inspectors asked Hutson about the check they seized at the time of his arrest, he stated, "Well, I don't know what it's about. It must be a mistake." 2 RT 257. Hutson told the agents that he had kept some photographs and agreed to allow them to search his home, office, and safe deposit box. In a locked drawer in Hutson's desk at McKesson Corporation, the agents recovered a box containing sexually explicit photographs, both polaroid and 35mm, and four 8mm movies. The postal inspectors also found the letter that Howard prepared on January 27, 1987, at the direction of Inspector Comfort.

We are confident that the government's cross-examination, when viewed in the context of the entire case, did not have an unfair prejudicial impact on the jury's deliberations. In this circumstance, the government's cross-examination "was not 'plain error' warranting the court to overlook the absence of any objection by the defense." *Young*, 470 U.S. at 14, 105 S.Ct. at 1046. Therefore, we will not accept Hutson's invitation to address the merits of his fifth and sixth amendment claims.

### IV.

We have carefully examined Hutson's other contentions and conclude that they are without merit. Therefore, we will affirm the appellant's conviction.

AFFIRMED.