IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-213

No. COA21-43

Filed 5 April 2022

Mecklenburg County, No. 17 CRS 206200

STATE OF NORTH CAROLINA,

v.

JAIME SUZANNE BOWEN, Defendant.

Appeal by Defendant from judgment entered 24 September 2019 by Judge George Cooper Bell in Mecklenburg County Superior Court. Heard in the Court of Appeals 6 October 2021.

> *Attorney General Joshua H. Stein, by Associate Attorney General Brian M. Miller, for the State.*
>
> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender Aaron Thomas Johnson, for Defendant-Appellant.*

WOOD, Judge.

¶ 1 Jaime Suzanne Bowen ("Defendant") appeals from a judgment entered following her conviction of extortion. On appeal, Defendant argues the First Amendment to the United States Constitution requires the word "threat" in N.C. Gen. Stat. § 14-118.4 to be construed in accordance with the term "true threat"; and as such, the evidence was insufficient to show she committed a true threat. After a

careful review of the record and applicable law, we affirm the judgment of the trial court.

## I.    Factual and Procedural Background

In 2011, Steven Nason ("Nason") visited Seeking Arrangement,[1] an online dating service where a "sugar daddy," seeks to meet a "sugar baby." At the time, Nason was married and had children. According to Nason, he accessed Seeking Arrangement because he believed his current marriage was difficult and he was "seeking . . . [another] relationship and . . . was willing to help someone financially."

Nason met Defendant, who was twenty-eight years of age, through the website. The parties began a sexual relationship that lasted a couple of months, during which time Nason provided Defendant with financial compensation. Thereafter, Nason divorced his wife in 2013 and re-married in 2016.

On December 9, 2016, Nason received a LinkedIn message from Defendant, stating to let her know if he "would ever want [sic] grab lunch []or dinner . . . ." When Nason did not respond to Defendant's initial message, Defendant sent two more messages to him over LinkedIn, and after acquiring his e-mail address, also e-mailed

---

[1] Seeking, originally called Seeking Arrangement, is a website where " 'sugar daddies' and 'sugar mommas' could meet 'sugar babies' by honestly sharing expectations for a relationship upfront. . . . Seeking is about identifying what drives us and how we can live our best lives with someone by our side." SEEKING, https://www.seeking.com/about-us (last visited March 25, 2022).

him. After the parties exchanged a few e-mails, Defendant informed Nason she was writing a book about her experience on Seeking Arrangement titled "The Sugar Lie." According to Defendant, the book was a "memoir of . . . [her] experience on Seeking Arrangement[]." Nason was included in Defendant's book because the two "pursued a paid, sexual, relationship from meeting on the site . . . ." Defendant explained she reached out to Nason, because there was "somebody interested in publishing" "The Sugar Lie," and she "needed to reach out to everybody that . . . [she] had written about . . . ." After receiving this e-mail, Nason retained an attorney to review and assist him with the situation.

¶ 5        When Nason did not respond to the e-mail, Defendant sent two certified letters to his home address. Therein, Defendant again alerted Nason about her book and stated she "had to send a certified letter to your ex-wife, as statements you made in regard to her in your marriage are to be included." In response, Defendant sent a letter to Nason asking, in relevant part, "[w]hat alternatives are available?"

¶ 6        Seventeen days later, Nason received an e-mail from Defendant's new e-mail address, Thesugarlie@gmail.com. Defendant explained to Nason she had "reached out to your ex-wife twice" and because Defendant's ex-wife had not responded, "the only person . . . [the ex-wife] will be able to come after for defamation . . . is you." Regarding possible alternatives, Defendant stated that other gentlemen had asked her "to consider working out a confidentiality agreement . . . [and she was] open to

discussing that." Defendant clarified that "all the other men who have asked me to consider a confidentiality agreement have made financial offers" ranging from $100,000.00 to $500,000.00.

¶ 7        Thereafter, Defendant began to e-mail Nason more frequently. Defendant pressured Nason to send his "offer" for a confidentially agreement by a certain deadline because she would soon decide "who's offer, if any, I will be accepting." When Nason failed to provide Defendant with an offer, Defendant e-mailed him stating that he would not receive a confidentiality agreement, and she would be "contacting the Dr. Phil show to see about getting on to promote . . . [her] book around the time it's coming out. . . . [and] [t]here may be a chance they might reach out to you to appear on the show or make a comment."

¶ 8        Notwithstanding Nason missing her initial deadline, Defendant continued to send messages to him through e-mail and LinkedIn in her effort to persuade him to make a monetary offer in exchange for a confidentiality agreement. After multiple messages without a response, Defendant e-mailed Nason on February 7, 2017, saying she would contact his current wife "for a statement since . . . [Nason is] going to have to tell her about the book and being on [s]eeking [a]rrangement[] . . . [and] since other women you met on there will probably come forward once the book is out."

¶ 9        That same day, Nason met with Detective Matthew Grimsley with the Charlotte Mecklenburg Police Department. Nason provided Detective Grimsley with

copies of the e-mails exchanged with Defendant, and Detective Grimsley initiated an investigation of Defendant. Thereafter, Nason coordinated every communication between himself and Defendant with Detective Grimsley.

¶ 10 Meanwhile, Defendant continued to demand Nason make her an "offer" and pay for a confidentiality agreement. Acting under Detective Grimsley's direction, Nason sent a message to Defendant with an offer of $250,000.00. Defendant accepted Nason's offer and sent a confidentiality agreement to him. On February 9, 2017, Nason asked Defendant to meet him in a public place to deliver the money. Detective Grimsley intended to arrest Defendant at the meeting. However, Defendant refused to meet in person, demanding instead that the funds be sent to her by wire transfer. At no point did Nason wire any money to Defendant.

¶ 11 On February 16, 2017, Detective Grimsley arrested Defendant at her apartment in Charlotte, North Carolina. After Defendant's arrest, the magistrate issued a search warrant, and Detective Grimsley, accompanied by other officers, returned to Defendant's apartment to conduct a search. The officers' search resulted in the seizure of confidentiality agreements between Defendant and multiple other men; however, the officers did not find any evidence of Defendant having written a book or being in contact with a publisher or Dr. Phil. On September 18, 2017, Defendant was indicted for extortion.

¶ 12 At trial, Defendant twice moved to dismiss the charges, but both motions were

denied. On September 24, 2019, the jury found Defendant guilty of extortion pursuant to N.C. Gen. Stat. § 14-118.4. That same day, the trial court sentenced Defendant to 16 to 29 months in confinement, suspended the sentence, and placed Defendant on 24 months of supervised probation. Defendant gave oral notice of appeal in open court.

## II.     Discussion

### A. Defendant's Constitutional Argument Was Preserved

At the outset, we address the State's contention that Defendant's argument on appeal was not preserved. Appellate Rule 10(a)(3) provides, "[i]n a criminal case, a defendant may not make insufficiency of the evidence to prove the crime charged the basis of an issue [later] presented on appeal unless a motion to dismiss the action, or for judgment as in case of nonsuit, is made at trial." N.C.R. App. P. 10(a)(3). A properly made motion to dismiss for insufficiency of the evidence under Appellate Rule 10(a)(3) "preserves *all* insufficiency of the evidence issues for appellate review . . . ." *State v. Golder*, 374 N.C. 238, 246, 839 S.E.2d 782, 788 (2020) (emphasis added). Although Rule 10(a)(3) requires a defendant to make a motion, the defendant is not required to "assert a specific ground for a motion to dismiss for insufficiency of the evidence." *Id.* at 245-46, 839 S.E.2d at 788 (citation omitted).

Here, the State argues since Defendant did not raise a constitutional argument in her motions to dismiss at the trial court, her argument is not preserved for appeal.

We disagree. Defendant was not required to state a specific ground for her motion to dismiss as a properly made motion to dismiss preserves all arguments based on insufficiency of the evidence. *Id.* Moreover, Defendant does not raise an entirely new issue on appeal, but rather argues the insufficiency of the evidence to support a conviction for extortion under her proposed Constitutional interpretation of N.C. Gen. Stat. § 14-118.4. We hold Defendant's motion to dismiss preserved for appellate review all issues surrounding sufficiency of the evidence, including the Constitutional argument Defendant now raises before this Court.

**B. North Carolina's Extortion Statute and The First Amendment**

¶ 15     On appeal, Defendant argues the trial court erred by denying her motion to dismiss because under the First Amendment, N.C. Gen. Stat. § 14-118.4 must be construed to apply only to true threats. We disagree.

¶ 16     In support of her sole argument on appeal, Defendant relies heavily upon *State v. Taylor* where this court held the First Amendment requires a "true threat" reading to be applied to every anti-threat statute. *State v. Taylor*, 270 N.C. App. 514, 849 S.E.2d 776 (2020), *rev'd,* 379 N.C. 589, 2021-NCSC0164. Therefore, we first determine whether the United States Constitution requires us to construe the North Carolina extortion statute's "threat" language as a "true threat" before reaching the merits of Defendant's sufficiency of the evidence argument.

¶ 17     On appeal, constitutional challenges and alleged violations are reviewed *de*

*novo. State v. Shackelford*, 264 N.C. App. 542, 551, 825 S.E.2d 689, 695 (2019). When an issue concerning the First Amendment arises, an appellate court must " 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.' " *Bose Corp. v. Consumers Union*, 466 U.S. 485, 499, 104 S. Ct. 1949, 1958, 80 L. Ed. 2d 502, 515 (1984). *E.g. State v. Taylor*, 379 N.C. 589, 2021-NCSC-164 ¶ 44.

¶ 18          Any state statute that criminalizes speech "must be interpreted with the commands of the First Amendment clearly in mind." *Watts v. United States*, 394 U.S. 705, 707, 89 S. Ct. 1399, 1401, 22 L. Ed. 2d 664, 667. The importance of the First Amendment is paramount within our State, and the trial court must construe any statute that criminalizes speech in accordance with the First Amendment, even if the statute does not explicitly require it. *See also State ex rel. North Carolina Milk Com. v. National Food Stores, Inc.*, 270 N.C. 323, 331, 154 S.E.2d 548, 554-55 (1967); *State v. Strickland*, 27 N.C. App. 40, 43, 217 S.E.2d 758, 760 (1975). The State bears "the burden of proving the speech it seeks to prohibit is unprotected." *Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 620, 123 S. Ct. 1829, 1841, 155 L. Ed. 2d 793, 810 n.9 (2003). Requiring the State, not the defendant, to prove whether disputed speech is unprotected speech ensures equity in court proceedings. *See Speiser v. Randall*, 357 U.S. 513, 526, 78 S. Ct. 1332, 1342, 2 L. Ed. 2d 1460, 1473 (1958) ("The man who knows that he must bring forth proof and persuade another of

the lawfulness of his conduct necessarily must steer far wider of the unlawful zone than if the State must bear these burdens.").

¶ 19    Recent cases from both our appellate courts and the federal courts identify an emerging trend in the law holding that the First Amendment requires all statutes governing threats be construed as a "true threat." *Watts*, 394 U.S. at 707, 89 S. Ct. at 1401, 22 L. Ed. 2d at 667; *United States v. Bagdasarian*, 652 F.3d 1113, 1117 (9th Cir. 2011). *Cf. Taylor*, at ¶ 17-19. *Watts v. United States* is among the first cases to act as the catalyst for the "true threat" analysis requirement under the First Amendment. In *Watts*, the defendant was convicted for knowingly and willfully threatening the President of the United States after he stated at a political rally

> [t]hey always holler at us to get an education. And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.

*Watts*, 394 U.S. at 706, 89 S. Ct. at 1401, 22 L. Ed. 2d at 666. The U.S. Supreme Court overturned the conviction reasoning "[t]he language of the political arena . . . is often vituperative, abusive, and inexact. . . . Taken in context, and regarding the expressly conditional nature of the statement and the reaction of the listeners," the defendant's speech could not be construed as a true threat. *Id.* at 708, 89 S. Ct. at 1401-02, 22 L. Ed. 2d. at 667. The holding in *Watts* established that the First Amendment "requires the [g]overnment to prove a true threat" exists when

prosecuting under a statute that criminalizes a pure form of speech. *Id.* at 708, 89 S. Ct. at 1401, 22 L. Ed. 2d at 667 (internal quotation marks omitted).

¶ 20    A "true threat" is an "objectively threatening statement communicated by a party which possess the subjective intent to threaten a listener or identifiable group." *State v. Taylor*, 379 N.C. 589, 2021-NCSC-164, ¶ 34. *See Virginia v. Black*, 538 U.S. 343, 359, 123 S. Ct. 1536, 1548, 155 L. Ed. 2d 535, 552 (2003). The speaker of the true threat need not intend "to carry out the threat. Rather, a prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." *Id.* at 360, 123 S. Ct. at 1548, 155 L. Ed. 2d at 552 (cleaned up) (citation omitted).

¶ 21    Our Supreme Court applied the holding in *Watts* to a North Carolina anti-threat statute for the first time in *State v. Taylor*. In *Taylor*, the defendant posted comments on Facebook against court officers, referencing that one officer would be the "first to go[,]" and another officer could incur "death to her as well." *Taylor*, at ¶ 2, 7. Ultimately, defendant was convicted under N.C. Gen. Stat. § 14-16.7(a) for knowingly and willfully making a threat to kill an officer of the court. *Id.* at ¶ 12-13. Defendant appealed, and, in reversing the trial court, this Court determined his conviction violated the true threat exception to the First Amendment. *Id.* at ¶ 3.

¶ 22    Subsequently, our Supreme Court affirmed the true threat exception to the

First Amendment, noting "[i]f defendant's Facebook posts contained any true threats, then it is indisputable that he could be criminally punished . . . [but if the] posts did not contain any true threats, then his expression is shielded by the First Amendment." *Id.* at ¶ 18. Our Supreme Court further stated "in defining and applying the true threats exception, a statute criminalizing speech must be interpreted with the commands of the First Amendment clearly in mind." *Id.* at ¶ 24 (internal quotation marks omitted) (quotation omitted). Ultimately, our Supreme Court held that the "Free Speech Clause of the First Amendment to the United States Constitution protect[s] defendant from being convicted solely for publishing the messages contained in his Facebook posts[.]" *Id.* at ¶ 4.

¶ 23        Here, Defendant urges this court to hold that the First Amendment of the United States Constitution requires we apply the "true threat" requirement to the terms within N.C. Gen. Stat. § 14-118.4 which sets forth the crime of Extortion. Whether N.C. Gen. Stat. § 14-118.4 falls under the "true threat" requirement of the First Amendment is a case of first impression. We decline to extend the "true threat" requirement to N.C. Gen. Stat. § 14-118.4 and hold the First Amendment does not require a threat under the terms of N.C. Gen. Stat. § 14-118.4 be a "true threat" to fall outside the protections of the First Amendment.

¶ 24        Generally, the First Amendment "prevents government from proscribing speech, . . . or even expressive conduct, . . . because of disapproval of the ideas

expressed." *R. A. V. v. St. Paul*, 505 U.S. 377, 382, 112 S. Ct. 2538, 2542, 120 L. Ed. 2d 305, 317 (1992). Our society, however, permits content-based restrictions on speech that is "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Id.*, 505 U.S. at 383, 112 S. Ct. at 2543, 120 L. Ed. 2d at 317 (quotation omitted). Categories of speech that may be restricted are those forms of speech intended and likely to "incite imminent lawless action, . . . obscenity, . . . defamation, . . . speech integral to criminal conduct, . . . so-called 'fighting words,' . . . child pornography, . . . fraud, . . . true threats, . . . and speech presenting some grave and imminent threat the government has the power to prevent . . . ." *United States v. Alvarez*, 567 U.S. 709, 717, 132 S. Ct. 2537, 2544, 183 L. Ed. 2d 574, 587 (2012). Although the "true threat" requirement under the First Amendment has been applied to speech surrounding political hyperbole, Courts have hesitated to apply the "true threat" requirement to extortion. *See also United States v. Quinn*, 514 F.2d 1250, 1268 (1975).

¶ 25       In the case before us, Defendant was convicted of extortion under Section 14-118.4. Extortion, though verbal, is a crime in and of itself. *United States v. Marchetti*, 466 F.2d 1309, 1314, (4th Cir. 1972). Like robbery or murder, extortion "refers to criminal conduct that has a commonly understood meaning providing ample notice of the conduct falling within its ambit, limiting the potential for abuse in enforcement,

and ensuring that protected First Amendment speech is not within its reach." *United States v. Coss*, 677 F.3d 278, 289 (6th Cir. 2012). Extortion is speech that is integral to criminal conduct, notwithstanding the content of the speech. It therefore falls within the category of unprotected speech, and necessarily may be restricted. *See also Alvarez*, 567 U.S. at 717, 132 S. Ct. at 2544, 183 L. Ed. 2d at 5887; *Seals v. McBee*, 898 F.3d 587, 597 (2017) (noting "extortion" is "unprotected speech"). As the Fifth Circuit colorfully expressed in *Quinn*, "[i]t may categorically be stated that extortionate speech has no more constitutional protection than that uttered by a robber while ordering his victim to hand over the money, which is no protection at all." *United States v. Quinn*, 514 F.2d 1250, 1268 (5th Cir. 1975). In *United States v. Kirsch*, the court found that true threat jury instructions should not be read in conjunction with extortion statutes, explaining "the extortion statutes at issue in this case already contain sufficient intent requirements. There is thus no need to further separate innocent conduct from wrongful conduct." *United States v. Kirsch*, 151 F. Supp. 3d 311, 318 (W.D.N.Y. 2015).

¶ 26    We agree with the reasoning of the federal courts and hold that extortionate speech as prohibited by N.C. Gen. Stat. § 14-118.4 is not constitutionally protected speech. Thus, a "true threat" application and analysis to Section 14-118.4 is unmerited.

¶ 27    Notwithstanding our holding, a statute prohibiting extortionate speech may

itself be unconstitutional. Other courts in the federal circuit have addressed the validity of extortion statutes under the First Amendment. The Sixth Circuit in *Coss* held an extortion statute did not violate the First Amendment when the statute was sufficiently "cabined by its own wrongful threat and intent to extort requirements to survive constitutional muster." *United States v. Coss*, 677 F.3d 278, 290 (6th Cir. 2012). In *United States v. Hutson*, the Ninth Circuit held a statute was valid under the First Amendment

> [b]ecause the statute in the present case is limited to extortionate threats, it does not regulate speech relating to social or political conflict, where threats to engage in behavior that may be unlawful may nevertheless be part of the marketplace of ideas. . . . The 'intent to extort' requirement of section 876 guarantees that the statute reaches only extortionate speech, which is undoubtedly within the government's power to prohibit.

843 F.2d 1232, 1235 (9th Cir. 1988).

¶ 28    As in *Coss* and *Hutson*, Section 14-118.4 contains the necessary intent and act requirements to pass constitutional muster. N.C. Gen. Stat. § 14-118.4 states: "Any person who threatens or communicates a threat or threats to another with the intention thereby wrongfully to obtain anything of value or any acquittance, advantage, or immunity is guilty of extortion and such person shall be punished as a Class F felon." N.C. Gen. Stat. § 14-118.4 (2021). Per the plain language of Section 14-118.4, the "intent" component of the section lies in the requirement that the

perpetrator must "communicate a threat or threats" while possessing the requisite intent to "wrongfully . . . obtain anything of value or any acquittance, advantage, or immunity . . . ." *Id.* The "act" component, in turn, rests in Section 14-118.4's prohibition of the crime of extortion within our State and does not limit speech "relating to social or political conflict." *Hutson*, 843 F.2d at 1235. Consequently, we hold Section 14-118.4 withstands First Amendment scrutiny as it prohibits only extortionate speech.

¶ 29        In this case, extensive evidence was presented to support Defendant's conviction of extortion. Defendant sent Nason multiple e-mails and letters asserting that she was writing a book about their "sugar daddy" and "sugar baby" relationship. Defendant told Nason she sent certified letters to his ex-wife regarding statements he had made about her. When Nason did not immediately offer to "purchase" a confidentiality agreement, Defendant sent frequent e-mails demanding Nason submit a bid for a confidentiality agreement. Defendant threatened, absent a confidentiality agreement, Nason's ex-wife could come after him for defamation, he may be asked to appear on the Dr. Phil show about the book, and his current wife would receive letters from Defendant. Under these facts, there was ample evidence to support the jury's finding Defendant committed extortion under Section 14-118.4.

¶ 30        Finally, Defendant concludes her argument on appeal by alleging the evidence was insufficient to show she committed a "true threat." As discussed *supra*, because

we hold the crime of extortion does not require a "true threat" under the First Amendment, we need not address this argument.

### III.    Conclusion

Following the U.S. Supreme Court and federal appellate opinions, we hold extortionate speech is criminal conduct in and of itself and, as such, is not constitutionally protected speech. Therefore, the First Amendment does not require that the "true threat" analysis be applied to N.C. Gen. Stat. § 14-118.4. Although statutes prohibiting extortionate speech may, as a whole, be unconstitutional, Section 14-118.4 is narrowly tailored as to only restrict extortionate speech, and thus is valid under the First Amendment. The evidence in this case supported the jury's finding that Defendant committed extortion in violation of Section 114-118.4. Accordingly, we discern no error in the judgment of the trial court.

NO ERROR.

Judges ZACHARY and CARPENTER concur.