DAVIS, Judge.
 

 *543
 
 In this appeal, we address the question of whether a defendant's criminal prosecution for violations of North Carolina's stalking statute infringed upon his constitutional right to free speech. Brady Lorenzo Shackelford ("Defendant") was convicted of four counts of felony stalking based primarily upon the content of posts made by him on his Google Plus account. Because we conclude that the application of the statute to Defendant's posts amounts to a violation of his right to free speech under both the First Amendment to the United States Constitution and Article 1, Section 14 of the North Carolina Constitution, we vacate his convictions.
 

 Factual and Procedural Background
 

 The State presented evidence at trial tending to establish the following facts: Defendant met "Mary"
 
 [1]
 
 on 3 April 2015 at a church in Charlotte, North Carolina prior to the start of a Good Friday worship service. Mary was employed in the church's communications department. The two of them were seated at the same table and briefly made small talk in a group setting before separating at the beginning of the service. Upon leaving church that day, Mary did not give any further thought to her encounter with Defendant.
 

 On 22 April 2015, Mary received an email from Defendant on her work email account that referenced their 3 April meeting and asked "for help with a company communications plan." Mary replied to his email later that day, informing him that she would be happy to assist him and
 
 *544
 
 suggesting a time for them to meet. Defendant responded shortly thereafter, agreeing to meet Mary on the date she had suggested.
 

 Later that same night, Defendant sent another email to Mary "to give [her] some information about [his] business[.]" In the email, Defendant detailed his plan to create a new business based in the British Virgin Islands. In the final paragraph of his email, Defendant wrote that he would pay Mary "100K out of the convertible note proceeds AND take [her] out to dinner at any restaurant in Charlotte."
 

 Defendant's email "set off a lot of red flags" for Mary. On 27 April 2015 she emailed Defendant to "cancel[ ] the meeting, thinking that his intentions were not really professional, and informed [her] boss" about the exchange. Later that day and again on 5 May 2015, Defendant emailed Mary in an attempt to reschedule their meeting. On 5 May 2015, Mary replied with links to online resources and wrote: "I won't be able to meet. If you have further questions, you can contact my boss[.]"
 

 On 19 May 2015, Defendant mailed a five-page handwritten letter to Mary's work address. At trial, Mary testified as follows with regard to this letter:
 

 The gist of it was that when [Defendant] first saw me at the Good Friday service he thought he had found his soul mate, and that the feelings he felt were so intense he couldn't talk to me. And then he goes on to
 
 *692
 
 say that he used the communications plan to talk to me, to ask me out, rather than for professional reasons[.]
 

 Defendant ended the letter by writing that he was "highly attracted" to Mary and asking her to go on a date with him. The following day, Mary gave the letter to her work supervisors and asked them to intervene on her behalf, and they agreed to do so. She did not respond to Defendant's letter.
 

 On 26 May 2015, Defendant sent Mary a second handwritten letter, which was seven pages long and mailed to her home address. At trial, Mary provided a summary of the second letter:
 

 He starts by apologizing for sending this to me without me giving him my address. He says he found it on a website. And he also says that he would not harass or stalk me, and that if I felt uncomfortable to notify him and he would cease communication. Then he goes on to talk about some of his personal history, and the last line says that I need to go on a date with him or tell him to leave me alone.
 

 *545
 
 Mary showed Defendant's letter to her supervisors, who once again told her that they would handle the situation.
 

 On 9 June 2015, Reverend Bill Roth, the Minister of Pastoral Care at the church, spoke to Defendant over the phone about his communications with Mary. During this phone call, Reverend Roth told Defendant "to stop making any contact [with Mary] and [that] there could be legal actions if he did, and that the contacts were unwanted." Following this conversation, Defendant did not send Mary any further emails or letters.
 

 In June of 2015, Mary logged into an account she had created on the social media service Google Plus. Upon doing so, she discovered that Defendant had "followed" her account sometime in late April of 2015 and had made four separate posts on his own Google Plus account in early June that referred to her by name. The posts on Defendant's Google Plus account were not specifically directed to Mary but were shared publicly on his account where any user of the service could read them.
 

 The first post, dated 2 June 2015, stated that "God chose [Mary]" to be Defendant's "soul mate." In the other three posts, Defendant wrote, among other things, that he "freely chose [Mary] as [his] wife" and wanted God to "please make [Mary]" his wife. After viewing these posts, Mary immediately blocked Defendant's account. Shortly thereafter, she deleted her own Google Plus account. Mary continued, however, to monitor Defendant's publicly shared posts by checking his Google Plus page "[a]t least once a week."
 

 Following his 9 June 2015 phone call with Reverend Roth, Defendant continued to post about Mary. None of his posts after that date referenced Mary by name, although one used her initials and another referred to her by a shortened version of her first name.
 

 On 19 June 2015, Defendant wrote the following post on his Google Plus account:
 

 There is a woman from my church that is turning me bat crazy. She is the first thing I see when I wake up in the morning and the last thing I see before I lay down at night. I strongly believe that she is an angel in disguise, that she is the girl that God sent down from heaven for me. I strongly believe that she is my soul mate, that she is my destiny. My heart aches for her.
 

 *546
 
 He posted as follows on 28 June 2015:
 

 I'm feeling depressed. There's a woman at my church that I want really, really bad, but she doesn't want me. I've prayed to God asking him to relieve this pain in my heart by allowing me to view just a small glimpse of her angelic face while in church, but God won't even give me that.?
 

 On 19 July 2015, Defendant wrote the following post:
 

 I've changed my relationship status because too many single & looking women are adding me to their circles. There is only one woman that I want, and her initials are [Mary's initials]. Even though we aren't dating yet, you might as well mark me down as being in a relationship because I am not interested in other women.
 

 He also posted a message on 2 August 2015 stating that "I believe the woman who
 
 *693
 
 introduced me to my soul mate at my church's Good Friday service is jealous and envious of my love for my soul mate and would rather me be with her instead of my soul mate."
 

 On 13 August 2015, a box of cupcakes was delivered to Mary's office at her work. Attached to the box was a typed, unsigned note that read: "[Mary], I never properly thanked you for the help you gave me regarding my company's communication plan, so, with these cupcakes, please accept my thanks."
 

 Upon receiving the cupcakes, Mary filed a police report with Detective Stephen Todd, an off-duty Charlotte-Mecklenburg Police Department officer who worked at the church, because she "felt like she was being stalked." Based upon Mary's report, Detective Todd applied for an arrest warrant against Defendant on a charge of misdemeanor stalking. Defendant was arrested on 14 August 2015 and subsequently released on bail.
 

 The same day that he was arrested, Defendant posted the following message on his Google Plus account:
 

 A woman I was interested in really, really bad has let it be known in no uncertain terms that she is not interested in me. Therefore, with a much heavy heart, I announce that I am officially single. :(
 

 The pain hurts because I dreamt about this woman and believed that she was my soul mate. How could God be so wrong???
 

 *547
 
 On 16 August 2015, Defendant posted another message:
 

 I study all religions, and I have been searching them all for the past day trying to find something, some quote, that would console me in my time of heartbreak. I just read something by Buddha that, instead of consoling me, actually made me angry. He said, "In the end, only three things matter: how much you loved, how gently you lived, and how gracefully you let go of things not meant for you."
 

 My question for Buddha is this: How do you know when something is not meant for you if you give up at the first sign of difficulty? Sometimes, God places difficulties in our lives because he wants us to be persistent in the face of those difficulties. For example, if a boy really wanted a girl, and the girl turned him down the first time he asked her out on a date, should he take Buddha's advice and gracefully let go of something not meant for him or should he continue courting the girl with the hope that she will one day say yes? If every guy let go of the girl who turned him down the first time, then there would be lots of marriages that never took place because he wasn't persistent. Had he been persistent, his persistence would have won her over by proving to her just how much he loved her. ...
 

 Later that same day, Defendant posted as follows on his Google Plus account:
 

 I have courted three Venus in Scorpios over the years, so I decided earlier this summer to learn everything that I could about Scorpios and Venus in Scorpios. I was reading this website about Scorpios this evening when I read a sentence that made me break out laughing so hard from the truth that I nearly died. The author was talking about their obsessiveness and stated, "Don't run away (you'll only be stalked)." I LMAO because I saw the behavior in all three women. Moreover, the Scorpio Ascendant in me completely understood where they were coming from.
 

 On 21 August 2015, Mary filed a petition for a no-contact order against Defendant in Mecklenburg County District Court. On 1 September 2015, the Honorable Becky Tin issued an order prohibiting Defendant from contacting Mary or "posting any information about [her] on social media."
 

 *548
 
 Later that month, Defendant authored the following post on his Google Plus account on the same date that Mary attended a Carolina Panthers football game: "Who is your favorite Carolina Panthers cheerleader? Mine is ... I'm not telling, least [sic] I upset my Venus in Scorpio future wife. ..." On 28 September 2015, Defendant posted: "OK, I've teased my Venus in Scorpio long enough. My favorite Carolina Panthers cheerleader is Emily. If she shows up missing, [shortened form of Mary's name], I'll know who to blame."
 

 *694
 
 Several weeks later, following a heavy rainstorm in South Carolina - where Mary's family lives - Defendant posted: "South Carolina got pummeled with rain. I pray my future wife's family is OK." On 4 October 2015, Defendant posed the following question on his account: "If you really loved someone and wanted to be with them forever, would you fly down to the Caribbean and secretly elope with them on a deserted island?"
 

 In an undated Google Plus post that was introduced as evidence at his trial, Defendant wrote, in relevant part, as follows:
 

 I would love to learn more about the dynamic between me and my future wife, but I don't know her personality type. I do know that she is either an INFJ or an INFP because of a pin on her Pinterest board. Unfortunately, her pin is confusing because she says that she is an INFP while the image she pinned is that of an INFJ. I guess I will just have to study both of them.
 

 On 24 November 2015, Defendant sent an email to a close friend of Mary's. The email began as follows:
 

 I know that you are best friends with [Mary]. In fact, I knew that you were best friends with Mary before you even added me to your circles on Google+. My question for you is this: You were present in the courtroom when [Mary] obtained a protective order against me, so why would you even add me to your circles if I am supposedly stalking [Mary]?
 

 Later in the email, Defendant wrote that Mary had a "moral responsibility to tell the full truth as to why she really charged me when we show up in court" and that the friend should "encourage [Mary] to tell the truth when we show up in court[.]"
 

 On Monday, 14 December 2015, Defendant posted the following on his Google Plus account:
 

 *549
 
 I'm going to send a personal email on Friday using my corporate email account, which doesn't have tracking software, instead of my Gmail account, which does have tracking software, because the final recipient knows that I have tracking software on my Gmail account, and I want her to share the email with as many people as possible without fear of me knowing who she is forwarding the email to.
 

 Two days later, he wrote: "I am so eager to marry my future wife that I would rather elope with her now than marry her in our church seven months from now."
 

 On Friday, 18 December 2015, Defendant sent another email to Mary's friend. In this email, he detailed his plans to issue a $500 million note as part of a viral marketing campaign that would ultimately result in him taking a polygraph test on CNN to prove that he had "talked to God over 20 times and seen his face 5 times[.]" According to Defendant, his televised polygraph test would provide Mary with an opportunity to save face and "tell the judge that I am obviously a righteous man and was in no way a threat towards her." Three days after sending this email, Defendant posted the following on his Google Plus account: "I just realized that I forgot my wife's birthday last week. I'm sorry, Babe[.]"
 

 Mary's friend forwarded both of the emails she had received from Defendant to Detective Todd. Based on these emails along with Defendant's Google Plus posts, Detective Todd obtained an arrest warrant against Defendant on 24 December 2015 for felony stalking. Defendant was subsequently indicted by a grand jury on eight additional counts of felony stalking on 4 April 2016. On 4 August 2017, Defendant filed a motion to dismiss all charges against him on the ground that the Google Plus posts giving rise to his charges were protected under the First Amendment.
 

 Defendant's jury trial began on 15 August 2017 in Mecklenburg County Superior Court before the Honorable Yvonne Mims Evans. Prior to the beginning of trial, the court denied the State's motion to amend the date on one of Defendant's indictments, and the State dismissed that charge. At the close of the State's evidence, the trial court granted Defendant's motion to dismiss the four stalking charges premised upon violations of the 1 September 2015 no-contact order. The court stated that it was doing so based upon its concern that the language in the no-contact order prohibiting Defendant from posting
 
 *695
 
 about Mary on social media "may be unconstitutional."
 
 *550
 
 On 18 August 2017, Defendant was convicted of each of the four remaining stalking offenses that were submitted to the jury. All of these convictions were based upon conduct that occurred after his 9 June 2015 phone call with Reverend Roth during which he was directed to cease his attempts to communicate directly with Mary. The trial court consolidated Defendant's convictions in 16 CRS 10028 and 16 CRS 10029 and sentenced him to a term of 17 to 30 months imprisonment. The court also imposed a consecutive sentence of 15 to 27 months imprisonment for his conviction in 16 CRS 10030. With regard to Defendant's conviction in 16 CRS 10034, the court sentenced Defendant to a term of 15 to 27 months imprisonment, suspended the sentence, and placed him on 36 months of supervised probation. Defendant gave notice of appeal in open court.
 

 Analysis
 

 On appeal, Defendant argues that the trial court erred by denying his motion to dismiss the four stalking charges for which he was ultimately convicted. He contends that because all of these charges were based - either in whole or in part - upon the content of his Google Plus posts, he could not constitutionally be convicted of stalking due to the resulting infringement of his right to free speech under the First Amendment to the United States Constitution and Article 1, Section 14 of the North Carolina Constitution. As such, he is asserting an as-applied challenge to North Carolina's stalking statute,
 
 N.C. Gen. Stat. § 14-277
 
 .3A.
 

 I. As-Applied Challenge to
 
 N.C. Gen. Stat. § 14-277
 
 .3A
 

 A. As-Applied Challenges Generally
 

 With regard to the distinction between facial and as-applied constitutional challenges, this Court has stated the following:
 

 [T]here is a difference between a challenge to the facial validity of [a statute] as opposed to a challenge to the [statute] as applied to a specific party. The basic distinction is that an as-applied challenge represents a plaintiff's protest against how a statute was applied in the particular context in which plaintiff acted or proposed to act, while a facial challenge represents a plaintiff's contention that a statute is incapable of constitutional application in any context. ... Only in as-applied challenges are facts surrounding the plaintiff's particular circumstances relevant.
 

 Town of Beech Mountain v. Genesis Wildlife Sanctuary, Inc.
 
 ,
 
 247 N.C. App. 444
 
 , 460,
 
 786 S.E.2d 335
 
 , 347 (2016) (internal citations,
 
 *551
 
 quotation marks, and brackets omitted),
 
 aff'd per curiam
 
 ,
 
 369 N.C. 722
 
 ,
 
 799 S.E.2d 611
 
 (2017).
 

 Here, Defendant's constitutional challenge is strictly an as-applied one. Thus, this case does not require us to consider the facial validity of
 
 N.C. Gen. Stat. § 14-277
 
 .3A.
 

 "The standard of review for alleged violations of constitutional rights is
 
 de novo
 
 ."
 
 State v. Roberts
 
 ,
 
 237 N.C. App. 551
 
 , 556,
 
 767 S.E.2d 543
 
 , 548 (2014) (citation and quotation marks omitted),
 
 disc. review denied
 
 ,
 
 368 N.C. 258
 
 ,
 
 771 S.E.2d 324
 
 (2015). Under the
 
 de novo
 
 standard, this Court "considers the matter anew and freely substitutes its own judgment for that of the lower tribunal."
 
 State v. Williams
 
 ,
 
 362 N.C. 628
 
 , 632-33,
 
 669 S.E.2d 290
 
 , 294 (2008) (citation and quotation marks omitted).
 

 B. Overview of
 
 N.C. Gen. Stat. § 14-277
 
 .3A
 

 N.C. Gen. Stat. § 14-277
 
 .3A provides, in pertinent part, as follows:
 

 (c)
 
 Offense.
 
 - A defendant is guilty of stalking if the defendant willfully on more than one occasion harasses another person without legal purpose or willfully engages in a course of conduct directed at a specific person without legal purpose and the defendant knows or should know that the harassment or the course of conduct would cause a reasonable person to do any of the following:
 

 ....
 

 (2) Suffer substantial emotional distress by placing that person in fear of death, bodily injury, or continued harassment.
 

 N.C. Gen. Stat. § 14-277
 
 .3A (2017).
 

 "Course of conduct" is defined in the statute as "[t]wo or more acts, including, but not
 
 *696
 
 limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means ... communicates to or about a person[.]"
 

 Id.
 

 N.C. Gen. Stat. § 14-277
 
 .3A defines "harassment" as "[k]nowing conduct, including written or printed communication or transmission ... and electronic mail messages or other computerized or electronic transmissions directed at a specific person that torments, terrorizes, or terrifies that person and that serves no legitimate purpose."
 

 Id.
 

 In this appeal, the State argues that Defendant's convictions were proper based on the theory that he engaged in an illegal "course of conduct" directed at Mary as that phrase is statutorily defined.
 
 *552
 

 C. First Amendment Principles
 

 "The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws abridging the freedom of speech."
 
 Reed v. Town of Gilbert, Ariz.
 
 , --- U.S. ----,
 
 135 S.Ct. 2218
 
 , 2226,
 
 192 L.Ed.2d 236
 
 , 245 (2015) (citation and quotation marks omitted). Article 1, Section 14 of the North Carolina Constitution provides that "[f]reedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained, but every person shall be held responsible for their abuse." N.C. Const. art. I, § 14. Our appellate courts have held that the free speech protections contained in the federal and North Carolina constitutions are "parallel and has addressed them as if their protections were equivalent."
 
 State v. Petersilie
 
 ,
 
 334 N.C. 169
 
 , 184,
 
 432 S.E.2d 832
 
 , 841 (1993) (citation omitted).
 

 "Posting information on the Internet - whatever the subject matter - can constitute speech as surely as stapling flyers to bulletin boards or distributing pamphlets to passersby - activities long protected by the First Amendment."
 
 State v. Bishop
 
 ,
 
 368 N.C. 869
 
 , 873,
 
 787 S.E.2d 814
 
 , 817 (2016) (citation omitted). Indeed, "the protections of the First Amendment extend in full not just to the Internet, but to all new media and forms of communication that progress might make available[.]"
 

 Id.
 

 at 874
 
 ,
 
 787 S.E.2d at 818
 
 (internal citation omitted).
 

 The United States Supreme Court has stated that "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."
 
 Police Dept. of City of Chicago v. Mosley
 
 ,
 
 408 U.S. 92
 
 , 95,
 
 92 S.Ct. 2286
 
 , 2290,
 
 33 L.Ed.2d 212
 
 , 216 (1972) (citation omitted). As a result, "[c]ontent-based laws - those that target speech based on its communicative content - are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."
 
 Reed
 
 , --- U.S. at ----,
 
 135 S.Ct. at 2226
 
 ,
 
 192 L.Ed.2d at 245
 
 (citation omitted). Conversely, "[g]overnment regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech."
 
 Ward v. Rock Against Racism
 
 ,
 
 491 U.S. 781
 
 , 791,
 
 109 S.Ct. 2746
 
 , 2754,
 
 105 L.Ed.2d 661
 
 , 675 (1989) (citation and quotation marks omitted).
 

 In
 
 Bishop
 
 , our Supreme Court recently addressed a constitutional challenge to North Carolina's cyberbullying statute.
 
 Bishop
 
 , 368 N.C. at 872,
 
 787 S.E.2d at 817
 
 . Although
 
 Bishop
 
 involved a facial - rather than an as-applied - challenge, we nevertheless find the Supreme Court's decision instructive in guiding our analysis in the present case.
 

 *553
 
 The provision of the cyberbullying statute being challenged in
 
 Bishop
 
 provided, in relevant part, as follows:
 

 (a) Except as otherwise made unlawful by this Article, it shall be unlawful for any person to use a computer or computer network to do any of the following:
 

 (1) With the intent to intimidate or torment a minor:
 

 ....
 

 d. Post or encourage others to post on the Internet private, personal, or sexual information pertaining to a minor.
 

 N.C. Gen. Stat. § 14-458.1
 
 (a)(1)(d) (2015).
 

 In assessing the constitutionality of that provision, our Supreme Court first analyzed whether the regulation implicated the First Amendment by restricting protected speech.
 

 *697
 

 Bishop
 
 , 368 N.C. at 872,
 
 787 S.E.2d at 817
 
 . After determining that the statute did, in fact, regulate protected speech because it "outlawed posting particular subject matter, on the internet, with certain intent[,]" the Court proceeded to its "second threshold inquiry" - whether
 
 N.C. Gen. Stat. § 14-458.1
 
 (a)(1)(d) was a content-based or content-neutral restriction.
 

 Id.
 

 at 873, 874
 
 ,
 
 787 S.E.2d at 817, 818
 
 . The Court explained the importance of this distinction as follows:
 

 This central inquiry determines the level of scrutiny we apply here. Content based speech regulations must satisfy strict scrutiny. Such restrictions are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests. In contrast, content neutral measures ... are subjected to a less demanding but still rigorous form of intermediate scrutiny. The government must prove that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.
 

 Id.
 

 at 874-75
 
 ,
 
 787 S.E.2d at 818
 
 (internal citations and quotation marks omitted). The Supreme Court ultimately concluded that the cyberbullying statute was content-based because it "defines regulated speech by its particular subject matter" in "criminaliz[ing] some messages but not others, and makes it impossible to determine whether the accused has
 
 *554
 
 committed a crime without examining the content of his communication."
 

 Id.
 

 at 876
 
 ,
 
 787 S.E.2d at 819
 
 (citation, quotation marks, and brackets omitted).
 

 The Court then proceeded to examine whether the challenged provision of the cyberbullying statute survived strict scrutiny. After determining that the protection of minors from online bullying represented a compelling governmental interest, it analyzed whether
 
 N.C. Gen. Stat. § 14-458.1
 
 (a)(1)(d) "embodies the least restrictive means of advancing the State's compelling interest in protecting minors from this potential harm."
 

 Id.
 

 at 878
 
 ,
 
 787 S.E.2d at 820
 
 . The Court ultimately held that the provision failed the strict scrutiny test and therefore violated the First Amendment, concluding as follows:
 

 Were we to adopt the State's position, it could be unlawful to post on the Internet any information relating to a particular minor. Such an interpretation would essentially criminalize posting
 
 any
 
 information about
 
 any
 
 specific minor if done with the requisite intent.
 

 ...
 
 N.C. Gen. Stat. § 14-458.1
 
 (a)(1)(d) could criminalize behavior that a robust contemporary society must tolerate because of the First Amendment, even if we do not approve of the behavior. ...
 

 In sum, however laudable the State's interest in protecting minors from the dangers of online bullying may be, North Carolina's cyberbullying statute creates a criminal prohibition of alarming breadth.
 

 Id.
 

 at 879
 
 ,
 
 787 S.E.2d at 821
 
 (citations, quotation marks, and brackets omitted).
 

 1. "Speech Integral to Criminal Conduct" Exception
 

 Having reviewed the pertinent legal principles implicated by Defendant's arguments on appeal, we now turn our attention to Defendant's constitutional argument itself. Before we apply the analysis applicable to challenges brought under the First Amendment, however, we must first address the threshold issue raised by the State that Defendant's Google Plus posts are excluded from First Amendment protection. Specifically, the State contends that Defendant's posts constitute "speech that is integral to criminal conduct" - a category of speech that falls outside of the protection provided by the First Amendment. We disagree.
 

 *555
 
 Although it is well established that content-based speech restrictions are presumptively invalid, certain categories of expression are wholly excluded from First Amendment protection.
 
 See
 

 U.S. v. Stevens
 
 ,
 
 559 U.S. 460
 
 , 468-69,
 
 130 S.Ct. 1577
 
 , 1584,
 
 176 L.Ed.2d 435
 
 , 444 (2010) (listing obscenity, defamation, fraud, and "speech integral to criminal conduct" as examples of "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem" (internal citations and quotation marks omitted) ). "[I]t rarely has been suggested that the constitutional freedom for
 
 *698
 
 speech ... extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute."
 
 New York v. Ferber
 
 ,
 
 458 U.S. 747
 
 , 761-62,
 
 102 S.Ct. 3348
 
 , 3357,
 
 73 L.Ed.2d 1113
 
 , 1125-26 (1982) (citation and quotation marks omitted);
 
 see
 

 id.
 

 at 758-59
 
 ,
 
 102 S.Ct. at 3355
 
 ,
 
 73 L.Ed.2d at 1124
 
 (holding ban on distribution of child pornography "passes muster under the First Amendment" because speech at issue was "intrinsically related to the sexual abuse of children").
 

 In evaluating the State's argument on this issue, we find the decision from the Illinois Supreme Court in
 
 People v. Relerford
 
 ,
 
 2017 IL 121094
 
 , ¶1,
 
 422 Ill.Dec. 774
 
 ,
 
 104 N.E.3d 341
 
 to be helpful.
 
 [2]
 
 In
 
 Relerford
 
 , the court invalidated certain provisions of Illinois' stalking and cyberstalking statutes as facially violative of the First Amendment.
 
 Id.
 
 at ¶63,
 
 422 Ill.Dec. at 789
 
 ,
 
 104 N.E.3d at 356
 
 . The challenged provision of the stalking statute - which was very similar to the pertinent language from
 
 N.C. Gen. Stat. § 14-277
 
 .3A - stated that "two or more nonconsensual communications to or about a person that the defendant knows or should know would cause a reasonable person to suffer emotional distress constitute a course of conduct sufficient to establish the offense of stalking."
 

 Id.
 

 at ¶29
 
 ,
 
 422 Ill.Dec. at 782
 
 ,
 
 104 N.E.3d at 349
 
 . In determining that the above-quoted provision was constitutionally invalid, the Illinois court rejected the state's argument that the statutory provision merely regulated speech integral to criminal conduct:
 

 In light of the fact that a course of conduct can be premised exclusively on two communications to or about a person, this ... is a direct limitation on speech that does not require any relationship - integral or otherwise - to
 
 *556
 
 unlawful conduct. Under [the statute], the speech
 
 is
 
 the criminal act.
 

 Id.
 
 at ¶45,
 
 422 Ill.Dec. at 785
 
 ,
 
 104 N.E.3d at 352
 
 .
 

 As noted above,
 
 N.C. Gen. Stat. § 14-277
 
 .3A provides, in pertinent part, as follows:
 

 (c)
 
 Offense.
 
 - A defendant is guilty of stalking if the defendant willfully on more than one occasion ... engages in a course of conduct directed at a specific person without legal purpose and the defendant knows or should know that the ... course of conduct would cause a reasonable person to do any of the following:
 

 ....
 

 (2) Suffer substantial emotional distress by placing that person in fear of death, bodily injury, or continued harassment.
 

 N.C. Gen. Stat. § 14-277
 
 .3A. Moreover, "[c]ourse of conduct" is defined in the statute as "[t]wo or more acts, including, but not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means ... communicates to
 
 or about
 
 a person[.]"
 
 N.C. Gen. Stat. § 14-277
 
 .3A(b)(1) (emphasis added).
 

 Thus, the pertinent statutory language at issue here is virtually identical to the statutory provision declared to be unconstitutional in
 
 Relerford
 
 in that two or more communications by a defendant to or about another person can constitute a course of conduct sufficient to support a stalking conviction. Here, all four of Defendant's indictments were premised either entirely or in part upon social media posts referencing Mary - posts that he wrote
 
 about
 
 Mary but did not send directly
 
 to
 
 her (or, for that matter, to anyone else). Pursuant to the language of
 
 N.C. Gen. Stat. § 14-277
 
 .3A, no additional conduct on his part was needed to support his stalking convictions. Rather, his speech itself was the crime.
 

 For this reason, the First Amendment is directly implicated by Defendant's prosecution under
 
 N.C. Gen. Stat. § 14-277
 
 .3A. We therefore reject the State's argument
 
 *699
 
 that Defendant's posts fall within the "speech integral to criminal conduct" exception.
 
 See
 

 United Food & Commer. Workers Local 99 v. Bennett
 
 ,
 
 934 F.Supp.2d 1167
 
 , 1208 (D. Ariz. 2013)
 
 *557
 
 ("[The statute] does not incidentally punish speech that is integral to a criminal violation; the speech itself is the criminal violation.").
 
 [3]
 

 2. Analysis Under First Amendment
 

 Having concluded that the First Amendment is, in fact, triggered by Defendant's convictions, we next proceed to analyze Defendant's free speech argument within the framework adopted by the United States Supreme Court. As an initial matter, in order to determine the appropriate level of scrutiny to apply, we must first decide whether the application of
 
 N.C. Gen. Stat. § 14-277
 
 .3A to Defendant's posts represented a content-based or content-neutral restriction on speech.
 

 Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. ... Our precedents have also recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be justified without reference to the content of the regulated speech[.]
 

 Reed
 
 , --- U.S. ----,
 
 135 S.Ct. at 2227
 
 ,
 
 192 L.Ed.2d at 245
 
 (internal citations and quotation marks omitted). Restrictions are also content-based if they are "concerned with undesirable effects that arise from the direct impact of speech on its audience or listeners' reactions to speech."
 
 McCullen v. Coakley
 
 ,
 
 573 U.S. 464
 
 , 481,
 
 134 S.Ct. 2518
 
 , 2531-32,
 
 189 L.Ed.2d 502
 
 , 517 (2014) (citation and quotation marks omitted).
 

 Once again, we find
 
 Relerford
 
 to be helpful to our analysis of this issue. There, the court concluded that the challenged provision of the Illinois stalking statute was a content-based restriction because the prohibition contained in the statutory language against "communications to or about a person that negligently would cause a reasonable person to suffer emotional distress criminalizes certain types of speech based on the impact that the communication has on the recipient."
 
 Relerford
 
 ,
 
 2017 IL 121094
 
 at ¶34,
 
 422 Ill.Dec. at 783
 
 ,
 
 104 N.E.3d at 351
 
 .
 

 Under the relevant statutory language, communications that are pleasing to the recipient due to their nature or
 
 *558
 
 substance are not prohibited, but communications that the speaker knows or should know are distressing due to their nature or substance are prohibited. Therefore, it is clear that the challenged statutory provision must be considered a content-based restriction because it cannot be justified without reference to the content of the prohibited communications.
 

 Id.
 

 (citation omitted). Similarly, in
 
 Bishop
 
 our Supreme Court determined that
 
 N.C. Gen. Stat. § 14-458.1
 
 (a)(1)(d) was a content-based restriction because the language of North Carolina's cyberbullying statute made it "impossible to determine whether the accused has committed a crime without examining the content of his communication."
 
 Bishop
 
 , 368 N.C. at 876,
 
 787 S.E.2d at 819
 
 .
 

 In the present case, based on the text of
 
 N.C. Gen. Stat. § 14-277
 
 .3A Defendant was subject to prosecution if he knew or should have known that his Google Plus posts "would cause a reasonable person to ... [s]uffer substantial emotional distress[.]"
 
 N.C. Gen. Stat. § 14-277
 
 .3A(c)(2). Such a determination simply could not be made without reference to the content of his posts.
 
 See
 

 Forsyth Cty. v. Nationalist Movement
 
 ,
 
 505 U.S. 123
 
 , 134,
 
 112 S.Ct. 2395
 
 , 2403,
 
 120 L.Ed.2d 101
 
 , 114 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation." (citation omitted) ).
 

 Therefore, we hold that as applied to Defendant
 
 N.C. Gen. Stat. § 14-277
 
 .3A constituted a content-based restriction on speech.
 

 *700
 
 As a result, our final step in the analysis is to determine whether the application of
 
 N.C. Gen. Stat. § 14-277
 
 .3A to the messages contained in Defendant's social media posts satisfies strict scrutiny review. We conclude that it does not.
 

 In order to survive a strict scrutiny analysis, "the State must show that the statute serves a compelling governmental interest, and that the law is narrowly tailored to effectuate that interest."
 
 Bishop
 
 , 368 N.C. at 876,
 
 787 S.E.2d at 819
 
 . As our Supreme Court has explained, "[t]he State must show not only that a challenged content based measure addresses the identified harm, but that the enactment provides the least restrictive means of doing so. Given this exacting scrutiny, it is perhaps unsurprising that few content based restrictions have survived this inquiry."
 

 Id.
 

 at 877-78
 
 ,
 
 787 S.E.2d at 820
 
 (internal citations and quotation marks omitted).
 

 In
 
 Bishop
 
 , the Supreme Court held that the challenged statute failed strict scrutiny because it did not "embod[y] the least restrictive means of advancing the State's compelling interest in protecting minors
 
 *559
 
 from [cyberbullying]."
 

 Id.
 

 at 878
 
 ,
 
 787 S.E.2d at 820
 
 . As discussed above, that statute criminalized "[p]ost[ing] or encourag[ing] others to post on the Internet private, personal, or sexual information pertaining to a minor" with the intent "to intimidate or torment a minor."
 
 N.C. Gen. Stat. § 14-458.1
 
 . In concluding that the statute failed strict scrutiny, the Supreme Court reasoned that "as to both the motive of the poster and the content of the posting, the statute sweeps far beyond the State's legitimate interest in protecting the psychological health of minors."
 
 Bishop
 
 , 368 N.C. at 878,
 
 787 S.E.2d at 821
 
 . The Court was particularly troubled by the scope of the statutory language prohibiting the posting of "private, personal, or sexual information pertaining to a minor," which "would essentially criminalize posting
 
 any
 
 information about
 
 any
 
 specific minor if done with the requisite intent."
 

 Id.
 

 at 879
 
 ,
 
 787 S.E.2d at 821
 
 .
 

 The Illinois Supreme Court invalidated the challenged provision of the stalking statute at issue in
 
 Relerford
 
 due to similar concerns about overbreadth. In concluding that the provision was unconstitutional, the court stated as follows:
 

 [S]ubsection (a) embraces a vast array of circumstances that limit speech far beyond the generally understood meaning of stalking. Indeed, the amended provision criminalizes any number of commonplace situations in which an individual engages in expressive activity that he or she should know will cause another person to suffer emotional distress. The broad sweep of subsection (a) reaches a host of social interactions that a person would find distressing but are clearly understood to fall within the protections of the first amendment.
 

 Relerford
 
 ,
 
 2017 IL 121094
 
 at ¶52,
 
 422 Ill.Dec. at 786-87
 
 ,
 
 104 N.E.3d at 353-54
 
 .
 

 Here, the State contends that the application of
 
 N.C. Gen. Stat. § 14-277
 
 .3A to Defendant's Google Plus posts is sufficient to withstand strict scrutiny because (1) the prevention of stalking "before it escalates into more harmful or lethal criminal behavior" is a compelling state interest; and (2) the statute is the least restrictive means of accomplishing this goal in that it "is limited to willful or knowing conduct, directed at a specific person, that would cause a reasonable person to suffer fear or substantial emotional distress." However, even assuming
 
 arguendo
 
 that the statute serves a compelling governmental interest in preventing the escalation of stalking into more dangerous behavior, we are not persuaded that the application of
 
 N.C. Gen. Stat. § 14-277
 
 .3A to Defendant's posts represented the least restrictive means of accomplishing that goal.
 

 *560
 
 Prior to Defendant's indictments, Mary had already sought and received a no-contact order in district court that prohibited him from approaching or contacting her. Given the existence of a no-contact order against Defendant, strict enforcement of the terms of that order clearly represented a less restrictive means by which the State could have pursued its interest in preventing Defendant from engaging in a criminal act against her.
 
 [4]
 

 *701
 
 The pertinent language of
 
 N.C. Gen. Stat. § 14-277
 
 .3A that formed the basis for Defendant's convictions is virtually identical to the provision in the Illinois stalking statute struck down as overbroad in
 
 Relerford
 
 . We believe the reasoning of the Illinois Supreme Court on this issue is both sound and equally applicable to the present case. As in
 
 Bishop
 
 , Defendant was convicted pursuant to a "criminal prohibition of alarming breadth" that "could criminalize behavior that a robust contemporary society must tolerate because of the First Amendment, even if we do not approve of the behavior."
 
 Bishop
 
 , 368 N.C. at 879,
 
 787 S.E.2d at 821
 
 (citation and quotation marks omitted). For these reasons, we hold that the application of
 
 N.C. Gen. Stat. § 14-277
 
 .3A to Defendant's social media posts constitutes a violation of his First Amendment rights in that applying the statute to him under these circumstances amounts to a content-based restriction on his speech that fails to satisfy strict scrutiny.
 

 II. Remedy
 

 Having determined that Defendant's Google Plus posts could not constitutionally form the basis for his convictions, we must separately examine the conduct giving rise to each of his four convictions to determine the extent to which each conviction was impermissibly premised upon his social media activity.
 

 A. 16 CRS 10028-30
 

 Defendant's conviction in 16 CRS 10028 was premised entirely upon five Google Plus posts that he made to his account between 27 September and 4 October 2015. Therefore, because the State did not rely on any other acts by him during this time period to support this charge, we vacate the conviction.
 

 *561
 
 With regard to 16 CRS 10029 and 10030, the date ranges on their respective indictments overlap. 16 CRS 10029 includes conduct that occurred between 13 August 2015 and 16 August 2015 while 16 CRS 10030 covers the time period from 2 June 2015 to 28 August 2015. Both charges are premised upon multiple Google Plus posts made by Defendant as well as the 13 August 2015 delivery of cupcakes to Mary's workplace - an act that fell within the date ranges of both indictments.
 

 Defendant's delivery of cupcakes to Mary - unlike his Google Plus posts - constituted non-expressive conduct rather than speech and therefore was not protected under the First Amendment.
 
 See
 

 id.
 

 at 872
 
 ,
 
 787 S.E.2d at 817
 
 ("We must first determine whether [the statute] restricts protected speech or expressive conduct, or whether the statute affects only nonexpressive conduct. Answering this question determines whether the First Amendment is implicated." (citation omitted) ). However, under the definition of the phrase "course of conduct" contained in
 
 N.C. Gen. Stat. § 14-277
 
 .3A, a single act is not enough to support a stalking conviction. Rather, "two or more acts" are required.
 
 N.C. Gen. Stat. § 14-277
 
 .3A(b)(1). Therefore, Defendant's convictions in 16 CRS 10029 and 10030 must also be vacated.
 

 B. 16 CRS 10034
 

 Defendant's indictment in 16 CRS 10034 encompassed the time period between 11 November 2015 and 22 December 2015. His indictment on that charge was premised upon three of his Google Plus posts along with the two emails that Defendant sent to Mary's friend.
 

 Even assuming - without deciding - that Defendant's emails to her friend are not entitled to First Amendment protection, this conviction must likewise be vacated. It is well established that where a defendant's conviction may have rested on a constitutional ground or an unconstitutional ground and it cannot be determined which ground the jury relied upon, the conviction must be vacated.
 
 See, e.g.,
 

 Griffin v. United States
 
 ,
 
 502 U.S. 46
 
 , 53,
 
 112 S.Ct. 466
 
 , 471,
 
 116 L.Ed.2d 371
 
 , 379 (1991) ("[W]here a provision of the Constitution forbids conviction
 
 *702
 
 on a particular ground, the constitutional guarantee is violated by a general verdict that may have rested on that ground.");
 
 Bachellar v. Maryland
 
 ,
 
 397 U.S. 564
 
 , 569-70,
 
 90 S.Ct. 1312
 
 , 1315,
 
 25 L.Ed.2d 570
 
 , 575 (1970) ("[T]he jury could have rested its verdict on any of a number of grounds. ... [P]etitioners may have been found guilty ... because they advocated unpopular ideas. Since conviction on this ground would violate the Constitution, it is our duty to set aside petitioners' convictions.").
 
 *562
 
 In the present case, the jury returned general verdicts that did not state the specific acts forming the basis for each conviction. For this reason, based on the record before us we cannot determine whether Defendant's conviction in 16 CRS 10034 was premised upon his social media posts, the emails to Mary's friend, or a combination of the two. Therefore, because this conviction may have likewise rested upon an unconstitutional ground, it must be vacated as well.
 
 See
 

 Stromberg v. California
 
 ,
 
 283 U.S. 359
 
 , 369-70,
 
 51 S.Ct. 532
 
 , 536,
 
 75 L.Ed. 1117
 
 , 1123 (1931) ("The first clause of the statute being invalid upon its face, the conviction of the appellant, which so far as the record discloses may have rested upon that clause exclusively, must be set aside.").
 

 * * *
 

 As this case aptly demonstrates, difficult issues arise in attempting to balance, on the one hand, society's laudable desire to protect individuals from emotional injury resulting from unwanted and intrusive comments with, on the other hand, the free speech rights of persons seeking to express themselves on social media. Our courts will no doubt continue to grapple with these issues going forward. In the present case, however, it is clear that Defendant's convictions violated his constitutional right to free speech. His Google Plus posts about Mary - while understandably offensive to her - constituted protected speech that cannot constitutionally be prohibited by the State. As such, we are compelled to vacate his convictions.
 
 [5]
 

 Conclusion
 

 For the reasons stated above, we vacate Defendant's convictions for felony stalking.
 

 VACATED.
 

 Judge HUNTER, JR. concurs.
 

 Judge MURPHY concurring by separate opinion.
 

 MURPHY, Judge, concurring by separate opinion.
 

 I concur with the Majority that Defendant's convictions under
 
 N.C. Gen. Stat. § 14-277
 
 .3A should be vacated. I write separately to
 
 *563
 
 express additional thoughts regarding the inapplicability of the First Amendment's speech integral to criminal conduct exception to Defendant's convictions.
 

 The U.S. Supreme Court, as the Majority notes, has long made clear that First Amendment protections of freedom of speech do not extend to "speech or writing used as an integral part of conduct in violation of a valid criminal statute."
 
 Giboney v. Empire Storage & Ice Co.
 
 ,
 
 336 U.S. 490
 
 , 498,
 
 69 S.Ct. 684
 
 , 688,
 
 93 L.Ed. 834
 
 , 841 (1949). It has been noted that the "boundaries and underlying rationale [of the speech integral to criminal conduct exception] have not been clearly defined, leaving the precise scope of the exception unsettled."
 
 U.S. v. Osinger
 
 ,
 
 753 F.3d 939
 
 , 950 (9th Cir. 2014) (Watford, J., concurring). The difficulties of applying this nebulous exception are compounded in the context of stalking crimes, where the lines between speech and non-speech conduct are often blurred. Thus, it is necessary to return to the basic tenet of the exception and carefully analyze the actions of a defendant to determine the exception's applicability, lest all speech be relabeled conduct and stripped of its First Amendment protections.
 
 [6]
 

 The State contends that this exception necessarily applies to the crime of stalking. It argues, "Stalking harasses and intimidates its victims. When these harms flow from any
 
 *703
 
 expressive aspect of stalking, that expressive aspect is integral to the crime." This is an oversimplification of the exception. "[S]peech or writing used as an
 
 integral part
 
 of conduct in violation of a valid criminal statute" falls within the exception and is unprotected by the First Amendment.
 
 Giboney
 
 ,
 
 336 U.S. at 498
 
 ,
 
 69 S.Ct. at 687
 
 ,
 
 93 L.Ed. at 841
 
 (emphasis added). Thus, the speech itself must be proximately linked to a criminal act and cannot serve as the basis for the criminal act itself.
 
 See
 

 Relerford
 
 ,
 
 2017 IL 121094
 
 at ¶ 45,
 
 422 Ill.Dec. at 785
 
 ,
 
 104 N.E.3d at 352
 
 (2017). Stated differently, there must be non-speech conduct to which the speech is integral.
 

 Here, the Majority notes that each indictment was "premised either entirely or in part upon social media posts referencing Mary - posts that he wrote
 
 about
 
 Mary but did not send directly
 
 to
 
 her (or, for that matter, to anyone else)." Section I(C)(1),
 
 supra
 
 . I believe this is a critical distinction in this case, as the nature of these posts cannot be conduct that serves as the basis for a stalking conviction. As our Supreme Court has noted, "[p]osting information on the Internet - whatever the subject matter - can constitute speech as surely as stapling flyers to bulletin
 
 *564
 
 boards or distributing pamphlets to passersby - activities long protected by the First Amendment."
 
 State v. Bishop
 
 ,
 
 368 N.C. 869
 
 , 873,
 
 787 S.E.2d 814
 
 , 817 (2016). This is of significant import under a First Amendment analysis, as one court has noted in an as-applied challenge to the federal statute, "[o]ne does not have to walk over and look at another person's bulletin board; nor does one Blog or Twitter user have to see what is posted on another person's Blog or Twitter account. This is in sharp contrast to a telephone call, letter or e-mail specifically addressed to and directed at another person ...."
 
 See
 

 U.S. v. Cassidy
 
 ,
 
 814 F.Supp.2d 574
 
 , 578 (D. Md. 2011). In the latter situation, there is speech
 
 to
 
 a person individually, whereas the former is merely speech
 
 about
 
 a person.
 
 [7]
 

 This is a key distinction because in cases where speech is made, such as through telephone harassment or unwanted contact through mailings, to a single recipient repeatedly, First Amendment considerations of protecting the communication of ideas is diminished when the recipient is an unwilling listener. The expressive value is diminished.
 
 See
 

 Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.
 
 ,
 
 547 U.S. 47
 
 , 66,
 
 126 S.Ct. 1297
 
 , 1310,
 
 164 L.Ed.2d 156
 
 , 175 (2006) ("Instead, we have extended First Amendment protection only to conduct that is inherently expressive[, such as flag burning]."). Yet, a public posting that is not aimed or directed at a single person retains its expressive value (assuming no other exceptions, such as true threats, is applicable to the speech). Of course, the ubiquitous nature of social media in modern society and the ability of posters to "tag" or "direct message" other users may impact this analysis; however, that is not the case with Defendant's Google+ postings. These postings, while numerous, cannot themselves constitute "conduct."
 
 See
 

 Bishop
 
 , 368 N.C. at 874,
 
 787 S.E.2d at 818
 
 ("Such communication does not lose protection merely because it involves the 'act' of posting information online, for much speech requires an 'act' of some variety - whether putting ink to paper or paint to canvas, or hoisting a picket sign, or donning a message-bearing jacket.")
 

 To be clear, there was action taken by Defendant that constituted non-speech conduct - sending cupcakes to Mary. However,
 
 *565
 

 N.C. Gen. Stat. § 14-277
 
 .3A permitted the jury to base their conviction in each indictment on the social media posts made to the public alone.
 
 See
 

 N.C. Gen. Stat. § 14-277
 
 .3A(b)(1) (defining course of conduct as "[t]wo or more acts ... in which the stalker
 
 *704
 
 ... communicates to or
 
 about
 
 a person ...") (emphasis added). As the Majority notes, this impermissibly allowed "the speech itself [to be] the crime" and did not require speech to be integral to separate conduct.
 
 See
 
 Section I(C)(1)
 
 supra
 
 .
 

 I also wish to address the State's citation of
 
 Osinger
 
 in support of its argument that Defendant's posts were speech integral to criminal conduct and explain why such a case upholding the constitutionality of the federal interstate stalking statute is distinguishable from the case and the statute before us. In
 
 Osinger
 
 , while analyzing the defendant's as-applied challenge to the federal interstate stalking statute, the Ninth Circuit held that "[a]ny expressive aspects of Osinger's speech were not protected under the First Amendment because they were 'integral to criminal conduct' in intentionally harassing, intimidating or causing substantial emotional distress."
 
 Osinger
 
 ,
 
 753 F.3d at 947
 
 . The
 
 Osinger
 
 case is fully distinguishable on two bases. First, Congress defined "course of conduct" as "a pattern of
 
 conduct
 
 composed of 2 or more acts, evidencing a continuity of purpose."
 

 Id.
 

 at 944 (citing
 
 18 U.S.C. § 2266
 
 (2) ) (emphasis added). Congress included no language indicating that a course of conduct could be established solely by two communications about a person, as is the case with
 
 N.C. Gen. Stat. § 14-277
 
 .3A. Moreover, as the
 
 Osinger
 
 concurrence noted, that case did not present the court with the question of whether a stalking prosecution would be constitutional in situations where "the defendant caused someone substantial emotional distress by engaging only in otherwise protected speech."
 
 Osinger
 
 ,
 
 753 F.3d at 954
 
 (Watford, J., concurring). Accordingly, our as-applied analysis differs from that in
 
 Osinger
 
 .
 

 In conclusion, I recognize the challenges that modern social media present in the context of stalking crimes. These challenges will continue to produce difficult questions of how to apply First Amendment principles, such as the speech integral to criminal conduct exception, in these increasingly complex situations. While many of these questions go beyond the scope of this concurrence or our Majority opinion, I concur in the case before us, as the First Amendment requires us to vacate Defendant's convictions.
 

 [1]
 

 A pseudonym is used throughout this opinion to protect the identity of the subject of Defendant's posts.
 

 [2]
 

 Although it is axiomatic that we are not bound by decisions from the appellate courts of another state unless we are applying the law of that jurisdiction, we are permitted to consider them as persuasive authority.
 
 See
 

 State v. Williams
 
 ,
 
 232 N.C. App. 152
 
 , 157,
 
 754 S.E.2d 418
 
 , 422 ("While we recognize that decisions from other jurisdictions are, of course, not binding on the courts of this State, we are free to review such decisions for guidance." (citation and quotation marks omitted) ),
 
 appeal dismissed and disc. review denied
 
 ,
 
 367 N.C. 784
 
 ,
 
 766 S.E.2d 846
 
 (2014).
 

 [3]
 

 While threats also constitute a type of speech that does not receive First Amendment protection,
 
 see
 

 Virginia v. Black
 
 ,
 
 538 U.S. 343
 
 , 359,
 
 123 S.Ct. 1536
 
 , 1547,
 
 155 L.Ed.2d 535
 
 , 552 (2003) ("[T]he First Amendment also permits a [s]tate to ban a true threat." (citation and quotation marks omitted) ), the State conceded at oral argument that none of Defendant's Google Plus posts constituted threats against Mary.
 

 [4]
 

 The trial court dismissed Defendant's stalking charges premised upon his violation of the portion of the no-contact order that prohibited him from "posting any information about [Mary] on social media" due to constitutional concerns. However, as counsel for Defendant acknowledged at oral argument, no similar concerns would have existed with regard to the provisions of the order requiring Defendant to refrain from approaching or directly contacting Mary.
 

 [5]
 

 Based on our ruling, we need not address the additional arguments Defendant has raised in this appeal.
 

 [6]
 

 See
 
 Eugene Volokh,
 
 The "Speech Integral to Criminal Conduct" Exception
 
 ,
 
 101 Cornell L. Rev. 981
 
 , 1039-40 (2016).
 

 [7]
 

 See
 
 Eugene Volokh,
 
 One-to-One Speech vs. One-to-Many Speech, Criminal Harassment Laws, and "Cyberstalking,"
 

 107 Nw. U. L. Rev. 731
 
 , 742 (2013) ("[Laws addressing telephone harassment, stalking, and unwanted mailings] have one thing in common: In the great bulk of their applications, they restrict what one may call 'unwanted one-to-one' speech - speech said to a particular person in a context where the recipient appears not to want to hear it, whether because the recipient has expressly demanded that the speech stop or because the speaker intends to annoy or offend the recipient. The laws are aimed at restricting speech
 
 to
 
 a person, not speech
 
 about
 
 a person. And that is the context in which they have generally been upheld against First Amendment challenge.")